UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA


United States of America,     )
                              )
              Plaintiff,      )
                              )
        vs.                   )        File No. 1:20-mj-358
                              )
Christopher Lewis Gillette,   )
                              )
              Defendant.      )


PARTIAL TRANSCRIPT OF
PRELIMINARY HEARING AND DETENTION HEARING



Taken at
United States Courthouse
Bismarck, North Dakota
August 20, 2020



BEFORE THE HONORABLE CLARE R. HOCHHALTER
-- UNITED STATES DISTRICT COURT MAGISTRATE JUDGE --

APPEARANCES

        MS. BRANDI SASSE-RUSSELL
        U.S. Attorney's Office
        220 E. Rosser Ave.
        P. O. Box 699
        Bismarck, North Dakota 58502-0699

                                    FOR THE UNITED STATES

                - - - - - - - - - -


        MR. LLOYD CLAYTON SUHR
        MR. JACKSON J. LOFGREN
        Suhr & Lofgren PLLC
        120 North Third Street, Suite 175
        P. O. Box 2393
        Bismarck, North Dakota 58502-2393

                                    FOR THE DEFENDANT

                - - - - - - - - - -


                    GOVERNMENT WITNESS

                                                    Page No.

Randy Larkin
    Direct Examination by Ms. Russell              3
    Cross-Examination by Mr. Suhr                  20
    Examination by The Court                       41


                - - - - - - - - - -


Certificate of Court Reporter - Page 43


                - - - - - - - - - -

1         (The above-entitled matter came before the Court, The

2    Honorable Clare R. Hochhalter, United States District Court

3    Magistrate Judge, presiding, commencing at 10:31 a.m.,

4    Thursday, August 20, 2020, in the United States Courthouse,

5    Bismarck, North Dakota.  The following partial proceedings were

6    had and made of record in open court with the defendant

7    appearing by videoconference beginning at 10:33 a.m., the same

8    day.)

9              - - - - - - - - - - -

10:33   10         MS. RUSSELL:  The United States would call Randy

11   Larkin.

12                        RANDY LARKIN,

13   having been first duly sworn, was examined and testified as

14   follows:

10:34   15                     DIRECT EXAMINATION

16   BY MS. RUSSELL:

17   Q.   Could you please state your name and current occupation?

18   A.   Randy Larkin, special agent, FBI.

19   Q.   And how long have you been in law enforcement?

10:34   20   A.   Since September of 2015.

21   Q.   And what is your current assignment?

22   A.   My current assignment is to the Williston, North Dakota,

23   resident agency out of the Minneapolis Division.

24   Q.   And what do your duties include?

10:34   25   A.   It's a two-man office.  We investigate crimes of any

                                  3

1    federal nexus, to include violent crimes against children,

2    drugs, white-collar -- white-collar crime, fraud, cyber,

3    counterterrorism, and violent crimes within the boundaries of

4    Indian reservations.

10:34    5    Q.   And what sort of training or education do you have to

6    undertake those duties?

7    A.   I have a -- hold a undergraduate degree in information

8    computer technology.  I have a Master's degree in information

9    assurance.  I have years of experience working in the private

10:35    10    sector and my experience -- training and experience as an FBI

11    agent.  Throughout the course of my time in Williston I've

12    conducted arrests, search warrants, controlled narcotic

13    purchases with confidential informants, and numerous

14    interviews.

10:35    15            THE COURT:  Ms. Russell, can I interrupt you just

16    briefly?  I want to clarify something for the record because

17    this came up, I think, during defendant's initial appearance as

18    well.  His name, Mr. Suhr, is it Christopher Wayne or

19    Christopher Lewis?

10:35    20            MR. SUHR:  Christopher Lewis, Your Honor.

21            THE COURT:  So when I said Christopher Wayne earlier

22    in calling this case, that's incorrect.  It's Christopher Lewis

23    Gillette.

24            MR. SUHR:  Correct.

10:36    25            THE COURT:  All right.  I think we'll get it right

4

1  going forward.  I apologize for the interruption, Ms. Russell.

2          MS. RUSSELL:  Not a problem, Your Honor.

3          THE COURT:  Thank you, Mr. Suhr.

4          MR. SUHR:  Thank you.

10:36  5  **Q.**  (MS. RUSSELL CONTINUING)  Please continue.

6  **A.**  I was finished.

7  **Q.**  Okay.  Sorry.  And you're familiar currently with the

8  charges against the defendant, that being second degree murder

9  in Indian country, correct?

10:36  10  **A.**  Yes.

11  **Q.**  And you did complete an affidavit or at least swore to an

12  affidavit for probable cause in this case previously, correct?

13  **A.**  Correct.

14  **Q.**  And can you explain to the Court how this matter initially

10:36  15  came to the attention of law enforcement?

16  **A.**  Yes, I can.  My morning began at approximately 7 o'clock

17  from Williston, when I started receiving phone calls and text

18  messages in regards to what had happened.

19  **Q.**  On what date was that?

10:36  20  **A.**  This was on Friday, August 14th.

21          THE COURT:  I'm going to interrupt again,

22  Ms. Russell, and ask that your witness slow down a bit.  Number

23  one, I listen slowly.  And number two, it'll help our court

24  reporter today as well, all right?  Thank you.

10:37  25          MS. RUSSELL:  Certainly.

1          THE WITNESS:  Yes, sir.

2  **Q.**   (MS. RUSSELL CONTINUING)  And that was of 2020, this year,

3  correct?

4  **A.**   Correct.

10:37  5  **Q.**   And on that date, please continue.  What happened?

6  **A.**   I was informed by law enforcement that a shooting had

7  occurred in the Twin Buttes area, within the boundaries of the

8  Fort Berthold Indian Reservation.  As I was -- once I had

9  agreed to respond, I began driving out there and met up with

10:37  10  our task force officers from Watford City Police Department.

11  We call them TFOs.  They're sworn law enforcement officers.

12  They're deputized to help us.

13          As I was driving out there, Sergeant -- Sergeant Cody

14  Smith of the tribal police -- Three Affiliated Tribes Police

10:37  15  Department called me and gave me the facts as they had -- the

16  events as they had occurred that morning.  Words followed.

17  Sergeant Smith told me that there was one individual who had

18  been shot, who was deceased.  There was an addition -- and his

19  name was James Cody Mossette.

10:38  20          He told me a second individual had been shot in the

21  head named Wayne Morin, who had been life-flighted out to

22  Bismarck for medical -- for emergency medical attention.  He

23  told me that the shooter was an individual named Christopher

24  Gillette and that Christopher was in custody in the back of

10:38  25  Sergeant Cody Smith's police vehicle.

1          At that time we were concerned with our legal

2    authority to enter the residence, and I advised Sergeant Smith

3    that we could receive consent from the owner of the house,

4    which was Marlien Gillette.  He -- he had also told me that

5    Marlien Gillette and an additional woman named Lisa Lee were

6    inside of the residence, and they were being looked after by

7    the sheriff's deputies that had responded on scene at that

8    time.

9          I was told by Sergeant Smith that we received consent

10   to search the residence.  When I arrived -- would you like me

11   to continue, or do you have a question?

12   **Q.**   So when law enforcement initially arrived on scene, there

13   were two males.  One was deceased, correct?

14   **A.**   Correct.

15   **Q.**   And where was the deceased male shot?

16   **A.**   He was shot in the chest.

17   **Q.**   And the other male was shot in the head, but he was still

18   alive and life-flighted out, correct?

19   **A.**   Yes.

20   **Q.**   And then there was also the defendant, Christopher

21   Gillette, correct?

22   **A.**   Correct.

23   **Q.**   And there was two other individuals on scene, two females,

24   correct?

25   **A.**   Correct.

1    **Q.**   And who were they?

2    **A.**   Marlien Gillette was -- is the mother of Christopher

3    Gillette.   She's the owner of the residence.   Lisa Lee is the

4    friend or girlfriend of Wayne Morin.   And just for the familial

5    relationships, to understand, James Cody Mossette, the

6    deceased, is Christopher Gillette's cousin, and so Marlien

7    Gillette's nephew as well.

8    **Q.**   Okay.   And so when -- you arrived at what point?

9    **A.**   I arrived between 10:00 and 10:30.

10   **Q.**   And did you assist in the search of the residence, or was

11   that already searched?

12   **A.**   No.   No, they had -- they had frozen the residence and

13   were awaiting my arrival, and they did not interview any of the

14   witnesses either.   The only piece of evidence that had been --

15   was the firearm, the weapon.   I was told by Sergeant Cody Smith

16   that he secured the weapon in his vehicle after taking

17   photographs of the location.

18   **Q.**   And where was the weapon located?

19   **A.**   The weapon was located on the table when the initial

20   responders, which was Dunn County Sheriff's Department,

21   arrived.

22   **Q.**   And describe the weapon.   Was there any ammunition or

23   bullets left in the weapon, or was it empty?

24   **A.**   No, there was not.   In the photos that I reviewed of

25   the -- from Dunn County, the weapon was -- had the slide locked

8

1    to the receiver, indicating it was empty, and the magazine was
2    off the side of it.
3    **Q.**   And then describe the search of the residence that then
4    took place when you arrived.
5    **A.**   Okay.  We began by -- we first went in there and did an
6    initial walk-through just to view.  I introduced myself and
7    greeted Marlien and Lisa and viewed the body, which had a sheet
8    over it at the time.
9         We then exited the residence and proceeded to take
10   what's called entrance photographs, which was from the street
11   view, walking into the residence.  I assisted the officers with
12   -- the TFOs with labeling the rooms, and then secured the
13   residence, secured the dog who was in there, in the basement.
14        After that I instructed the TFOs on the appropriate
15   -- the necessary and appropriate paperwork and how to conduct
16   the search, which they were familiar with, evidence and chains
17   of custody, as they're sworn law enforcement officers, so they
18   were familiar with all this.  And I requested Sergeant Smith's
19   assistance to begin collecting statements from the witnesses.
20   **Q.**   And what did you find of any relevance then in the house
21   related to this incident?
22   **A.**   At the conclusion of the search we collected, I believe,
23   approximately 50-something items.  There was drugs, drug
24   paraphernalia, meth residue -- or methamphetamine residue.  I
25   apologize.  Sorry.  There was marijuana, marijuana

9

1   paraphernalia.  We collected bloody clothing.  We collected

2   some swabs, a hat with a bullet hole in it, which Wayne Morin

3   was wearing at the time, and we collected the firearm.

4          THE COURT:  Ms. Russell, excuse me.  Agent Larkin, if

5   you maybe move back a little bit from the microphone, make sure

6   it's in front of you, and then we'll have less of that

7   interference on some of the -- like the Ps and the like.

8          THE WITNESS:  Yes, sir.

9          THE COURT:  And speak up, of course, and speak

10  slowly --

11         THE WITNESS:  Okay.

12         THE COURT:  -- if you would, even slower than you

13  think is slow, okay?

14         THE WITNESS:  Okay.

15         THE COURT:  Go ahead.  Sorry.

16  **Q.**   (MS. RUSSELL CONTINUING)  Were there any casings

17  consistent with the weapon being fired?

18  **A.**   Yes, we collected three shell casings.

19  **Q.**   And you indicated that there were some evidence of drugs

20  or methamphetamine.  Where was that located?

21  **A.**   Methamphetamine residue was located on the table.

22  **Q.**   And where was that at, in what area?

23  **A.**   On the kitchen table.  The kitchen table had been moved in

24  order to facilitate the paramedics in rescue efforts.

25  **Q.**   And then you indicated that both Lisa Lee and the mother

10:42

10:43

10:43

10:43

10:43

1   -- her name again?

2   **A.**   Marlien Gillette.

3   **Q.**   -- Marlien were both interviewed.  Let's talk first about

4   Lisa Lee.  What -- did she provide again what had happened

10:43   5   during this incident?

6   **A.**   Lisa Lee told me that that morning she had arrived at the

7   residence with Cody Mossette, Wayne Morin and herself in a

8   champagne-colored vehicle.  They arrived somewhere between 5:30

9   and 6:00, I believe.

10:44   10   **Q.**   In the morning?

11   **A.**   In the morning, yes.  They -- Cody entered the residence

12   first from the north door, which was the side door of the

13   house.  Cody then came back out and got Wayne and Lee, and they

14   went inside and sat down at the table.

10:44   15   Christopher Gillette came out and was irate at the

16   time that they had arrived, but he greeted everybody and sat

17   down with them.  There was methamphetamine use by some or all

18   of the individuals at the table.  There was arguments in

19   regards to either the methamphetamine use or the arrival time.

10:45   20   Chris walked -- Christopher got up from the table,

21   walked back to his room and retrieved a pistol, which was

22   holstered in a concealed -- in what's called an inside-the-

23   waistband holster and clipped it to his pants.  He walked back

24   out, and he sat down.

10:45   25   Some more arguments transpired.  Christopher stood up

11

1   and shot three times.  He -- one round hit Cody in the chest,

2   another round missed, and the third round hit Wayne Morin in

3   the head and then shattered the sliding glass door.

4   **Q.**   Now, Lisa Lee, she didn't admit to using methamphetamine,

5   correct?

6   **A.**   Not at the time, no, she didn't.

7   **Q.**   Okay.  This was afterwards, correct, you received that

8   information?

9   **A.**   Yes.

10  **Q.**   Now, Marlien, you spoke with her?

11  **A.**   Yes.

12  **Q.**   And what did she indicate?  What did she know of this

13  incident?

14  **A.**   Marlien told me that the shots woke her up from her sleep.

15  When she came out, she saw Christopher.  Christopher was -- had

16  put the gun down on the table and yelled -- was yelling, "Call

17  911.  Call 911."  Christopher began CPR and lifesaving aid for

18  Cody.  And Marlien had got the 911 dispatchers on the call, and

19  her and Christopher alternated lifesaving measures on Cody over

20  the phone.

21  **Q.**   And she initially thought she heard three shots, correct,

22  according to her statement?

23  **A.**   Correct.

24  **Q.**   And that's what woke her up and brought her to the

25  kitchen?

10:45
10:46
10:46
10:46
10:47

12

1    **A.**    Correct.

2    **Q.**    Now, did law enforcement indicate to you when they

3    initially arrived on scene, any statements that the defendant

4    made initially to them?

10:47    5    **A.**    Yes.  Sergeant Smith indicated to me that the defendant

6    made an utterance of, "This was a bad mistake.  The gun just

7    went off."

8    **Q.**    And you indicated that he was interviewed, though,

9    subsequent to that, correct?

10:47    10   **A.**    I interviewed him subsequent to that, correct.

11   **Q.**    And tell me about the first interview that the

12   defendant -- that you did with the defendant.

13   **A.**    For the first interview the defendant told me that he was

14   sleeping and that he thought somebody was -- broken into the

10:47    15   residence.  He grabbed his gun, walked out and saw some

16   shadows, was very scared and frightened and started shooting.

17   And once the lights came on, he realized who he had shot and

18   began lifesaving measures.

19   **Q.**    So the first statement he basically thought a burglar had

10:48    20   broken into the house and essentially started shooting at what

21   he thought were just strangers, correct?

22   **A.**    That's correct.

23   **Q.**    Now, you interviewed him a second time, correct?

24   **A.**    That's correct.

10:48    25   **Q.**    And what did he provide in his second statement?

13

**A.**   The second statement he told me he had lied to me
previously in the first interview and he -- the shooting
occurred because he was upset that the individuals were in his
house using methamphetamine and getting high.

**Q.**   And he admitted to all four of them being at the table,
correct?

**A.**   Correct.

**Q.**   And that he was angry at them at some point and had asked
them to leave?

**A.**   Yes.

**Q.**   Did he talk about going and getting the gun and coming
back?

**A.**   Yes, he was just going to scare them with it.

**Q.**   And talk about that, more detail about that second
interview.

**A.**   In the second interview I tried to -- or I asked
Christopher if he could give me a little bit more information
on -- he was saying that they came at him.  He was not -- was
not able to provide much detail in regards to how or who came
at him aside from he was scared and the gun, it just -- he just
started shooting.  I asked him, "Did anyone have any guns or
knives?"  And he said, "No.  Well, actually, I don't remember."

**Q.**   And is the defendant an enrolled member of the Fort
Berthold Three Affiliated Tribes?

**A.**   Yes.

**Q.**   And did you find anything in the residence as far as any
other weapons or anything of that nature?

**A.**   There were -- when I was inside the residence, I noticed
that there were some pocketknives.  There was a pocketknife on
the table, and I asked about it.  They -- the officers and
agents who were conducting the search just said it was there
when they had gotten there, and there was no indication in any
of the testimony that there were any -- that any of the
individuals in there had any weapons.

**Q.**   Well, you talked about a pocketknife.  Describe what we're
talking about, size and -- describe it.

**A.**   It was a -- just a steel folding knife, maybe this --
about this big (indicating).

**Q.**   So very small?

        THE COURT:  Can you indicate in terms of inches what
you were -- I missed it.

        THE WITNESS:  I believe maybe five to six inches
folded.

**Q.**   (MS. RUSSELL CONTINUING)  And it was folded when you seen
it --

**A.**   Yes.

**Q.**   -- on the table?  Now, you initially again indicated you
had seen methamphetamine residue on the table, correct?

**A.**   I was told by the officers conducting the search that they
had found methamphetamine, and I began questioning everybody,

1   Marlien, Lisa and Christopher, in regards to the

2   methamphetamine.

3   **Q.**   But you didn't find actual methamphetamine, correct?

4   **A.**   That's correct.

10:51   5   **Q.**   Were you able to find out more about that later on?

6   **A.**   Yes, I was.  I was notified that Marlien Gillette had

7   requested us to return to the residence because she had more to

8   tell us.  Marlien told me that she had lied to me about the

9   drug use when I asked her, and she said that prior to the --

10:51   10   any first responders arriving, Chris was yelling, "Get that

11   shit out of here."  And Marlien leaned over, and Lisa placed a

12   bong and meth into the container, and Marlien took it

13   downstairs and put it in a box.  She showed officer -- she

14   showed us when we came there the second time to the residence

10:52   15   of where she had placed it.

16        Additionally, there was another box of marijuana,

17   which -- which she indicated that she had placed under the

18   sink, and officers and agents had located that during the

19   search and seized it.

10:52   20   **Q.**   And the current status at this point in time of Morin, is

21   he still alive at this time?  What is his condition?

22   **A.**   The last status I received was that Morin was intubated,

23   and, well, from what I understand, is on life support.  He's

24   not responsive, but I was told by the nurse that his heart and

10:52   25   lungs are strong and he could go another month like that.

16

1          MS. RUSSELL:  That's all the questions I have at this

2  time, Your Honor, unless, Your Honor, if you'd like me to go

3  into the detention portion of this at the same time or if you

4  want me to wait on that.

10:53    5           THE COURT:  Well, I think, Mr. Suhr, our plan was to

6  combine the two, am I right?  And so going into testimony

7  related to detention is reasonable under the circumstances.

8  Would you agree, Mr. Suhr?

9          MR. SUHR:  I guess I was planning on addressing the

10:53   10  preliminary hearing portion first and then presenting the

11  defendant's mother on the question of detention, Your Honor.  I

12  don't have any questions --

13          THE COURT:  What we end up doing is probably

14  recalling the witness later then, so what I'm asking is, can we

10:53   15  go ahead with counsel's questions related to detention?

16          MR. SUHR:  Oh, I'm sorry, Your Honor.  I

17  misunderstood.

18          THE COURT:  Just a matter of efficiency.  I

19  understand what counsel is suggesting, and I appreciate that as

10:53   20  well, but go ahead, Ms. Russell.

21          MS. RUSSELL:  I just have a few more questions then,

22  Your Honor.

23  **Q.**   (MS. RUSSELL CONTINUING)  Are you familiar with the

24  defendant's history?

10:54   25  **A.**   Yes.

17

1  **Q.**   And you also spoke with him a little bit about some of his

2  history, correct?

3  **A.**   Extensively.   That first interview was about 90 minutes,

4  Chris first spoke to us.

10:54   5  **Q.**   And you talked a bit about guns and some of his gun use,

6  correct, and some of his past instances related to gun use?

7  **A.**   Yes, I did.

8  **Q.**   And can you describe to the Court some things that you

9  talked to him about as far as his usage of guns and violent

10:54   10  episodes in the past?

11  **A.**   Yes.   The -- there was numerous instances of Christopher

12  mishandling weapons and firearms.   The first that I can

13  remember was there was additional bullet holes in the kitchen

14  floor.   There was about eight of them.   We questioned Marlien

10:54   15  Gillette and Christopher Gillette about those holes, and we

16  were told that there was an incident where Christopher got

17  drunk and started shooting into the floor.   That was the first

18  one.

19        When Christopher was asked by Sergeant Smith in the

10:55   20  interview if he had ever discharged a firearm out of anger,

21  Christopher explained that he was upset that his girlfriend had

22  been killed in a car accident and -- while carrying his child.

23  He walked outside and shot in anger, a shotgun, into the air.

24        There was a third incident where there were -- it was

10:55   25  -- Christopher was handling a rifle inside the residence, in

18

1    his room, and additionally -- and shot the floor once again.

2         And the last instance I can recall is of Christopher

3    explaining that there was a time where someone was -- his

4    neighbors and friends were outside of the residence.  They were

10:55   5    throwing rocks.  They ended up throwing rocks and breaking out

6    his taillight in his car.  Christopher chased them and was

7    unable to catch them, so he called the police.

8         And then Christopher then told me that he waited --

9    or we learned that Christopher waited some time and then went

10:56   10   back down and shot out the taillights in retaliation.  When I

11   questioned Christopher as to why he had left that part out when

12   we asked him, he was remorseful and apologized and said he had

13   forgotten.

14   Q.   And did you also talk to his girlfriend about some prior

10:56   15   episodes of potential violence as well?

16   A.   Just briefly, yes.

17   Q.   And what did you learn from that?

18   A.   I learned that there was an incident in July of 2020, and

19   I don't necessarily remember the details, but the police were

10:56   20   called.  Christopher had been drinking.

21        THE COURT:  Hang on.  Mr. Gillette, can you still

22   hear us?

23        THE DEFENDANT:  Yes, I can.  I can see you too.

24        THE COURT:  Okay.  Well, we lost our video of you,

10:57   25   but if you can hear us, we can continue with the hearing.  All

19

1  right, Mr. Suhr?

2      MR. SUHR:  That's fine, Your Honor.

3      THE COURT:  All right.  Go ahead, Ms. Russell.

4  Q.  (MS. RUSSELL CONTINUING)  You were explaining about a

10:57 5  July 2020 incident?

6  A.  Yes, the July 2020 incident was just briefed to me very

7  briefly when I spoke with his girlfriend, and there was --

8  again, there was a -- it was a domestic incident with some

9  violence and some alcohol consumption where she had feared for

10:57 10  her life.

11  Q.  And it involved the defendant as well?

12  A.  Yes, that was -- yes.

13      MS. RUSSELL:  That's all the questions I have at this

14  time, Your Honor.

10:58 15      THE COURT:  All right.  Mr. Suhr.

16      MR. SUHR:  Thank you, Your Honor.

17                    <u>CROSS-EXAMINATION</u>

18  <u>BY MR. SUHR</u>:

19  Q.  Agent Larkin, what time on August 14th did you arrive at

10:58 20  the residence?

21  A.  I believe it was about 10:20.

22  Q.  A.m.?

23  A.  Correct, a.m.

24  Q.  In relation to the time of the underlying incident, how

10:58 25  long afterwards then would that have been?

1   **A.**   That would have been approximately four hours.

2   **Q.**   Are you aware -- other than what was provided to you by

3   Officer Smith, are you aware personally of any of the specific

4   investigative steps that took place between the initial point

10:59   5   law enforcement arrived and your arrival?

6   **A.**   Yes, I am.

7   **Q.**   Other than what other law enforcement told you, though.

8   You're -- you're dependent entirely on what other officers told

9   you occurred before your arrival, isn't that correct?

10:59   10   **A.**   That's correct.

11   **Q.**   So your only personal knowledge of what occurred from an

12   investigative standpoint is from what happened once you

13   arrived, isn't that correct?

14   **A.**   And collecting witness testimony, correct.

10:59   15   **Q.**   After your arrival.

16   **A.**   Yes.

17   **Q.**   You've stated that when law enforcement first arrived on

18   the scene, there were three individuals present, Cody Mossette,

19   Wayne Morin, and Lisa Lee, correct?

10:59   20   **A.**   Correct.

21   **Q.**   And then also Marlien Gillette was there, so I guess four.

22   **A.**   Correct.

23   **Q.**   You testified that consent to enter the residence was

24   obtained.  Perhaps I missed it, but from whom was consent to

11:00   25   enter the residence obtained?

1  A.   Marlien Gillette signed a consent form with Sergeant Cody

2  Smith.

3  Q.   And did he show that to you, or did he just tell you?

4  A.   He showed that to me.

11:00   5  Q.   Okay.  And based on that consent, entry was made.

6  A.   That's correct.

7  Q.   You stated that the weapon was located on the kitchen

8  table.

9  A.   Yes.

11:00   10  Q.   And that it was not loaded at the time?

11  A.   Yes.

12  Q.   And that the magazine had been set off to the side.

13  A.   Yes.

14  Q.   To your knowledge, did anyone in law enforcement unload

11:00   15  the weapon, clear the chamber, or remove the magazine?

16  A.   No.

17  Q.   Do you know who, if anyone, cleared the chamber, unloaded

18  the weapon, or removed the magazine?

19  A.   No.

11:01   20  Q.   You described a walk-through of the residence.  Did you do

21  that personally?

22  A.   Yes.

23  Q.   Had there been a walk-through prior to your arrival?

24  A.   No, except for whatever law enforcement had to do to

11:01   25  respond to the lifesaving measures.

1   **Q.**   Who took the photos?

2   **A.**   Task Force Officer Dylan Bostic.

3   **Q.**   Were those photos taken prior to your arrival or

4   subsequent to your arrival?

11:01   5   **A.**   Subsequent to my arrival.

6   **Q.**   Were there any photos taken prior to your arrival?

7   **A.**   Yes.

8   **Q.**   Who took those?

9   **A.**   Some officers of Dunn County - I don't recall specifically

11:01   10   - as well as officers of the -- or I believe as well as

11   Sergeant Cody Smith of Three Affiliated Tribes.

12   **Q.**   Would you be considered lead on this case for purposes of

13   the multiagency response?

14   **A.**   Yes.

11:02   15   **Q.**   So all evidence and photographs taken would ultimately go

16   to you?

17   **A.**   Yes.

18   **Q.**   Approximately how many photos have been taken, sir?

19   **A.**   Approximately 500.

11:02   20   **Q.**   And you've testified there were around 50 items collected.

21   **A.**   Correct.

22   **Q.**   Did you personally collect any of those items, Agent?

23   **A.**   I did not.

24   **Q.**   Other officers involved in the investigation did?

11:02   25   **A.**   Yes.

1   Q.   Were those items collected before your arrival or after?

2   A.   After my arrival.  The only item collected prior was the

3   firearm.

4   Q.   You testified that on the kitchen table there was meth

11:02   5   residue.

6   A.   Yes.

7   Q.   How was that determined to be meth residue, sir?

8   A.   It was field-tested onsite.

9   Q.   Who tested it?

11:02   10   A.   One of the task force officers.

11   Q.   You testified there was marijuana as well?

12   A.   Yes.

13   Q.   How did that get determined to be marijuana?

14   A.   Familiarity of smells, experience, training.

11:03   15   Q.   You described there was paraphernalia present.  Was that

16   paraphernalia for use with a specific substance?

17   A.   I don't know specifically.

18   Q.   Was there a smoking device for methamphetamine found?

19   A.   Yes, after -- well, there was a smoking device found in

11:03   20   the vehicle which the -- they had arrived in.  And then there

21   was a smoking device which was collected after we visited the

22   residence the second time and given to us by Marlien.

23   Q.   Okay.  So at the time of the incident, the vehicle in

24   which Mr. Mossette, Mr. Morin and Ms. Lee arrived was searched,

11:03   25   correct?

24

1  **A.**   Not -- no, it was the -- there was a pipe in plain view at

2  that time.  We did not search the vehicle until the house was

3  complete.

4  **Q.**   Okay.  Thank you.  But the paraphernalia -- the meth

11:04   5  paraphernalia was found in the vehicle that Mr. Morin,

6  Mr. Mossette and Ms. Lee arrived in.

7  **A.**   I'm not positive if that was meth paraphernalia

8  specifically, but I believe it could be used for -- I believe

9  it's a smoking device, yes.

11:04  10  **Q.**   Has it been submitted to the North Dakota State Crime Lab

11  for analysis?

12  **A.**   Not yet, sir.

13  **Q.**   Okay.  Is it in evidence?

14  **A.**   Yes.

11:04  15  **Q.**   Who's the evidence custodian for purposes of this

16  investigation?

17  **A.**   The evidence is secured at the -- well, the drug evidence

18  was dropped off.  We sealed it and dropped it at Watford City

19  Police Department, and the rest of the evidence was brought

11:04  20  by -- brought to my office, the Williston R.A.

21  **Q.**   So some of it's in Williston, and some of it's in your

22  office.

23  **A.**   Some -- yeah, some of it is in Watford City, and some of

24  it is in my office, yes.  We have a policy requiring two agents

11:05  25  to transport drugs and drug paraphernalia.

1   **Q.**   And then you said that there was a -- there was drug

2   paraphernalia later that was turned over by Christopher

3   Gillette's mother, Marlien.

4   **A.**   Yes.

11:05   5   **Q.**   With respect to the methamphetamine residue on the kitchen

6   table, was that swabbed or collected in any way?

7   **A.**   That was collected, yes.

8   **Q.**   When you interviewed Ms. Lee, she acknowledged getting to

9   the residence, 5:30 to 6 o'clock a.m.

11:05   10   **A.**   Yes.

11   **Q.**   Was she asked why they came at such a strange hour?

12   **A.**   Yes.

13   **Q.**   Why is that?

14   **A.**   They -- she explained to me that they were going to stay

11:05   15   either the night or the day there.

16   **Q.**   Okay.  But did she explain where they had been prior to

17   this?

18   **A.**   Yes.

19   **Q.**   Where were they?

11:05   20   **A.**   They were in the Mandan-Bismarck area.

21   **Q.**   Did she say what they were doing?

22   **A.**   They were at a friend's trailer.  They made a stop for gas

23   and food, and they made a stop for her to pick up clothing from

24   a friend.

11:06   25   **Q.**   Had she stated what they were doing at this friend's

26

1   trailer?

2   **A.**   No.

3   **Q.**   Was she asked what they were doing at the friend's

4   trailer?

11:06   5   **A.**   Yes.

6   **Q.**   And why didn't she answer that question?

7   **A.**   She didn't -- she just said they were hanging out.

8   **Q.**   She testified or she -- excuse me.  You testified that she

9   told you that Cody Mossette first entered the Gillette

11:06   10   residence, then came back out and got Mr. Morin and Ms. Lee to

11   come in, correct?

12   **A.**   Correct.

13   **Q.**   And then is that when the three of them sat down at the

14   kitchen table?

11:06   15   **A.**   Yes.

16   **Q.**   And what were they doing at the kitchen table?

17   **A.**   Just sitting there.

18   **Q.**   So they just came and sat there.

19   **A.**   That's what I was told, yes.

11:06   20   **Q.**   How'd the meth residue get on the kitchen table?

21   **A.**   I asked that and was not provided a sufficient answer.

22   **Q.**   So Ms. Lee provided you some information, but wouldn't

23   provide you other information.

24   **A.**   That's correct, yeah.

11:07   25   **Q.**   Did you ask Ms. Lee specifically if she had been using

27

1   methamphetamine prior to this incident?

2   **A.**   Yes.

3   **Q.**   And what did she tell you?

4   **A.**   No.

11:07   5   **Q.**   She denied it.

6   **A.**   Yes.

7   **Q.**   Were any steps taken to corroborate her denial?

8   **A.**   No.

9   **Q.**   Was she asked if she would submit to a urine screen?

11:07   10   **A.**   No.

11   **Q.**   Why wasn't she asked if she would submit to a urine

12   screen?

13   **A.**   At that time -- at the time that we -- it was confirmed

14   that they were smoking methamphetamine.  After Christopher had

11:07   15   told me, Lisa had already left the residence.

16   **Q.**   You have familiarity with controlled substances, Agent?

17   **A.**   Yes, I do.

18   **Q.**   Would you agree that controlled substances can affect the

19   accuracy of information provided by a person who has used

11:08   20   controlled substances?

21   **A.**   Yes.

22   **Q.**   Were you interested in the accuracy of Ms. Lee's

23   statement?

24   **A.**   Yes.

11:08   25   **Q.**   And you took no steps to confirm whether or not she had

28

1   used any controlled substances.

2   **A.**   We did not, no.

3   **Q.**   Did you ask Ms. Lee if Mr. Mossette had used controlled

4   substances?

11:08   5   **A.**   Yes.

6   **Q.**   And what did she say?

7   **A.**   She didn't know.

8   **Q.**   She had been with him the whole night prior?

9   **A.**   She stated on the way over that they -- no one was smoking

11:08   10   or getting high.

11   **Q.**   Was Mr. Mossette at the friend's trailer she described

12   being at earlier?

13   **A.**   Yes.

14   **Q.**   And she was with him then at the trailer.

11:08   15   **A.**   She was, yes.

16   **Q.**   And she didn't know if he had used any controlled

17   substances at the trailer.

18   **A.**   Correct.

19   **Q.**   What was her demeanor when you asked her about meth use

11:08   20   for herself or Mr. Mossette?

21   **A.**   She was cooperative, but appeared to be being untruthful

22   at the time.

23   **Q.**   Did you ask Ms. Lee about whether or not Mr. Morin had

24   used any controlled substances?

11:09   25   **A.**   Yes.

29

1   **Q.**   What did she say?

2   **A.**   The same, she didn't know, and she didn't know what they

3   were doing prior to meeting up with her.

4   **Q.**   And she had been with Mr. Morin previously at the friend's

5   trailer as well?

6   **A.**   Yes.

7   **Q.**   Did she say how long they had been together prior to this

8   incident?

9   **A.**   I don't remember, no.  Possibly the afternoon or early

10  evening.

11  **Q.**   With respect to Mr. Mossette and to Mr. Morin, to your

12  knowledge, have toxicology samples been taken from either of

13  them in the course of their subsequent medical treatment?

14  **A.**   I believe Mr. Mossette, yes.  If a forensic examination

15  was done on the body, I'm not positive.

16  **Q.**   Have you received any preliminary results yet?

17  **A.**   I was told they were picked up by an agent in Bismarck.  I

18  have not reviewed them or -- no.

19  **Q.**   So as of right now you're uncertain about whether there's

20  any toxicology-based evidence one way or the other on whether

21  Mr. Mossette had used methamphetamine or any other controlled

22  substance.

23  **A.**   Correct.

24  **Q.**   As I understand it, Mr. Morin remains in the hospital?

25  **A.**   Yes.

30

1   Q.   As a part of his medical care, have you secured any -- any

2   hospital records?

3   A.   Not yet, no.

4   Q.   Or I should say as a part of your investigation, are you

11:10   5   planning to get those records?

6   A.   Yes.  Yes.

7   Q.   To your knowledge, will there be toxicology records?

8   A.   To my knowledge, yes, but I'm not positive.

9   Q.   Did Ms. Lee say that Mr. Gillette had used

11:10   10   methamphetamine?

11   A.   No.

12   Q.   Did you ask her if Mr. Gillette had used methamphetamine?

13   A.   Yes.

14   Q.   And what -- what specially did she say when you asked her

11:11   15   that?

16   A.   She didn't know.

17   Q.   She didn't describe seeing him use in the kitchen?

18   A.   No.

19   Q.   Okay.  And she hadn't been with him at all prior to the

11:11   20   incident, correct?

21   A.   Correct.

22   Q.   You said that Mr. Mossette was cousins with Mr. Gillette,

23   is that correct?

24   A.   That's correct.

11:11   25   Q.   Did you have any evidence of animosity between

31

1   Mr. Mossette and Mr. Gillette?

2   **A.**   No.

3   **Q.**   You testified that Marlien Gillette was -- told you she

4   was woke up by the gunshots.

11:11   5   **A.**   Yes.

6   **Q.**   And she confirmed hearing multiple shots.

7   **A.**   Yes.

8   **Q.**   Three, I believe, is what you stated, correct?

9   **A.**   Correct.

11:11   10   **Q.**   And when she came out to the kitchen area, Mr. Gillette

11   was actually begging to call 911, correct?

12   **A.**   Yes.

13   **Q.**   And he was actually doing CPR on Mr. Mossette, isn't that

14   correct?

11:11   15   **A.**   That's correct.

16   **Q.**   So he was attempting to save his life.

17   **A.**   That's correct.

18   **Q.**   And then it was Ms. Gillette -- it was Marlien Gillette

19   that called 911?

11:12   20   **A.**   Yes.

21   **Q.**   And then she also assisted in providing CPR as best she

22   could?

23   **A.**   Yes.

24   **Q.**   Cody Smith told you that -- Officer Smith, I should say -

11:12   25   excuse me - told you that he had spoken to Mr. Gillette, who

32

1   told him that this was a bad mistake and the gun just went off.

2   **A.**   Yes.

3   **Q.**   You had that information before your first interview with

4   Mr. Gillette, didn't you?

11:12   5   **A.**   Yes.

6   **Q.**   Okay.  Did Officer Smith elaborate further on

7   Mr. Gillette's statement that this was a bad mistake?

8   **A.**   No.

9   **Q.**   Did Officer Smith elaborate further on Mr. Gillette's

11:12   10   statement that the gun just went off?

11   **A.**   No.

12   **Q.**   Did you ask for any detail on that?

13   **A.**   Yes.

14   **Q.**   And what did Officer Smith tell you, sir?

11:12   15   **A.**   Oh, I asked for -- we asked Christopher for detail about

16   it.

17   **Q.**   Okay.  So you got that information --

18   **A.**   Yes.

19   **Q.**   -- from Mr. Gillette.

11:12   20   **A.**   Yes.

21   **Q.**   Thank you.  When you then interviewed Mr. Gillette -- you

22   didn't arrive at the residence until about four hours after the

23   incident, so what time did you interview Mr. Gillette?

24   **A.**   It was -- it was after Lisa and after Marlien, so it was

11:13   25   about 1:30 or 1:50.

1    Q.    Where did you interview him, sir?

2    A.    In the laundry room.

3    Q.    Of the residence?

4    A.    Yes.

11:13    5    Q.    Describe his demeanor when you interviewed him, please.

6    A.    He was remorseful.  He was cooperative.

7    Q.    When you interviewed him, did you recite his Miranda

8    rights?

9    A.    Yes.

11:13    10    Q.    Did you interview him with a recording device?

11    A.    Yes.

12    Q.    Did you use that recording device?

13    A.    Yes.

14    Q.    So is there a digital or a video recording of the

11:13    15    interview?

16    A.    Yes.

17    Q.    He described to you this initial version of events that

18    involved a burglary of unknown individuals, correct?

19    A.    Yes.

11:13    20    Q.    Did you confront him with the information Officer Smith

21    had previously provided you?

22    A.    In regards to the accident?

23    Q.    Yes, sir.

24    A.    Yes.

11:14    25    Q.    During that first interview?

34

**A.**   Yes.

**Q.**   What did he say?

**A.**   He didn't know.  It just went off, and he was scared.

**Q.**   Did you at the time know of Mr. Gillette's educational level?

**A.**   No.

**Q.**   Were you aware at the time he only had a eighth grade education?

**A.**   No.

**Q.**   Did he seem to have trouble understanding your questions?

**A.**   No.

**Q.**   Did you -- are you familiar, sir, with physical indicators if somebody has used controlled substances?

**A.**   Yes.

**Q.**   Would that include usage of marijuana?

**A.**   Yes.

**Q.**   Would that include usage of methamphetamine?

**A.**   Yes.

**Q.**   What kinds of signs would you be looking for if someone had used marijuana?

**A.**   If someone had used marijuana?

**Q.**   Yes, sir.

**A.**   I would be looking for them to be a little bit more low key, maybe some eye -- some red, bloodshot eyes and just more relaxed than they would normally be not using that substance.

1  Q.   Did you see any indicators that Mr. Gillette had used

2  marijuana?

3  A.   I didn't see any in his eyes, but Mr. Gillette was relaxed

4  and he was comfortable with us.

11:15   5  Q.   What would you be looking for with respect to signs an

6  individual has used methamphetamine?

7  A.   Just about the same general sort of -- maybe sporadic --

8  maybe they're -- they tell you one thing and then immediately

9  recant what they've previously told you.

11:15   10  Q.   I'm talking physical manifestations.

11  A.   Physical manifestations, I'm not -- I don't know.

12  Q.   You testified you have familiarity with physical signs if

13  an individual has used methamphetamine.  Are you saying that

14  you do or you don't?

11:15   15  A.   I do.

16  Q.   Okay.  So did you see any signs of methamphetamine --

17  physical manifestations of methamphetamine use in Mr. Gillette?

18  A.   No.

19  Q.   Did you see physical signs of methamphetamine use in Ms.

11:16   20  Lee?

21  A.   No.

22  Q.   Did you look for them?

23  A.   Yes.

24  Q.   And what did you look for?

11:16   25  A.   I looked to see if she was -- again, the same.  I looked

36

1  to see if she would recant and change and tweak her answers a

2  little bit, and I was -- I didn't find any, no.

3  **Q.**   Okay.  What time did you say your initial interview with

4  Mr. Gillette was, sir?

5  **A.**   I believe it was approximately 1:45.

6  **Q.**   P.m.?

7  **A.**   Yes.

8  **Q.**   And you did a subsequent interview with Mr. Gillette.

9  **A.**   Yes.

10  **Q.**   What time was that interview?

11  **A.**   5:45.

12  **Q.**   Where was that interview?

13  **A.**   In the rear of Sergeant Smith's police car.

14  **Q.**   Was Mr. Gillette handcuffed?

15  **A.**   Yes.

16  **Q.**   Were his Miranda rights read to him again?

17  **A.**   Yes.

18  **Q.**   Who read them?

19  **A.**   Both myself and Cody Smith --

20  **Q.**   And --

21  **A.**   -- Officer Cody Smith, sir.

22  **Q.**   At that time, isn't it a fact that Mr. Gillette actually

23  came forward and acknowledged his previous statement about the

24  burglary incident wasn't true?

25  **A.**   Yes.

37

1  Q.   You never actually had to confront him specifically about

2  it.  He owned up to it.

3  A.   I confronted him specifically about it.  I -- I told him

4  that I knew that he lied to me, and I would give him one more

11:17  5  chance to tell me what happened.

6  Q.   And then he told you that the shooting had occurred

7  because he was upset.

8  A.   Yes.

9  Q.   Okay.  He told you that he was just going to scare them

11:17  10  with the gun.

11  A.   Yes.

12  Q.   And he told you that they came at him.

13  A.   Yes.

14  Q.   Did he say who it was that came at him?

11:17  15  A.   No.

16  Q.   Did he describe an incident of wrestling over the gun?

17  A.   No.

18  Q.   The injuries to Mr. Mossette, you said, were in the chest

19  area?

11:17  20  A.   Yes.

21  Q.   Has gunshot residue analysis been done with respect to

22  Mr. Mossette?

23  A.   No.

24  Q.   Is it going to be done?

11:17  25  A.   Yes.

1   **Q.**   Who is going to do that?

2   **A.**   I'll take appropriate steps.  I'm not positive right now.

3   **Q.**   So as of right now you don't have any information about

4   the distance Mr. Mossette was away at the time of the shot.

11:18   5   **A.**   No.

6   **Q.**   At this time you don't have any information about the

7   angle of the shot.

8   **A.**   I was told that the bullet hole found in the wall

9   indicated that the angle of the shot was downward.  I was told

11:18   10   that by Task Force Officer Dylan Bostic.

11   **Q.**   Was Mr. Mossette standing or sitting at the time of the

12   shooting?

13   **A.**   Unknown.  Possibly getting up or sitting.

14   **Q.**   If he had been getting up, then that would be consistent

11:18   15   with Mister -- with Mr. Gillette's statement that someone came

16   at him.

17   **A.**   Yes.

18   **Q.**   With respect to Mr. Morin, do you have any evidence or any

19   information about whether gunshot residue analysis will be

11:18   20   done?

21   **A.**   It will be done.

22   **Q.**   And do you have any information about the angle of the

23   shot with respect to Mr. Morin?

24   **A.**   I was told -- I was told that it was -- entered under his

11:19   25   left ear and exited, I guess, upwards on the top of his head.

39

1    Q.   Do you have any information that he was seated or standing

2    at the time of the shot?

3    A.   I don't know.

4    Q.   The pistol that was recovered was what caliber?

11:19   5    A.   Nine-millimeter.

6    Q.   And a semiautomatic?

7    A.   Yes.

8    Q.   What does that mean?

9    A.   Well, what that means is that you have to pull the -- you

11:19   10   have to squeeze -- press the trigger every time to fire a shot.

11   Q.   Do you know what the trigger pull on the gun was?

12   A.   No.

13   Q.   Has it been analyzed for that?

14   A.   It will be, yes.

11:19   15   Q.   When you returned to the residence to talk to Marlien,

16   wasn't that in response to being contacted and advised that law

17   enforcement had left behind drug paraphernalia?

18   A.   Yes.

19   Q.   And that she came forward with everything that had been

11:19   20   seized?

21   A.   Yes.

22   Q.   And provided it willingly?

23   A.   Yes.

24            MR. SUHR:  Nothing further, Your Honor.  Thank you.

11:20   25            THE COURT:  Ms. Russell?

40

1    MS. RUSSELL:  I have no additional questions, Your

2    Honor.

3    THE COURT:  I have a couple of questions for you.

4                        EXAMINATION

11:20   5    BY THE COURT:

6    Q.    Agent Larkin, where is -- this was Twin Buttes?

7    A.    Yes.

8    Q.    Where is that located, approximately?

9    A.    980 Highway 8 North, I believe, is the address.

11:20  10    Q.    Is it near any large cities?  Is it a small town?

11    A.    It's a very small town, yes, sir.

12    Q.    About how small?

13    A.    I think the closest is Halliday, I believe.  I was

14    unfamiliar with the location.

11:20  15    Q.    All right.  Close to Halliday?

16    A.    Yes.

17    Q.    How far from Williston or Bismarck?

18    A.    It is -- it was about two-and-a-half to three hours.

19    Q.    Okay.  Do you know about how many people live in Twin

11:20  20    Buttes?

21    A.    No, I don't.

22    Q.    Is it more than 5,000?

23    A.    I don't know.

24    THE COURT:  Okay.  Any other questions, Ms. Russell?

11:21  25    MS. RUSSELL:  No, Your Honor.

1          THE COURT:  Mr. Suhr?

2          MR. SUHR:  No, Your Honor.

3          THE COURT:  You're excused.  Thanks.  Any other

4    witnesses?

11:21    5          MS. RUSSELL:  I have no additional witnesses, Your

6    Honor.

7          (The partial transcript is concluded at 11:21 a.m.,

8    the same day.)

9                    - - - - - - - - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    <u>CERTIFICATE OF COURT REPORTER</u>

2            I, Sandra E. Ehrmantraut, a Certified Realtime

3    Reporter,

4            DO HEREBY CERTIFY that I recorded in shorthand the

5    foregoing proceedings had and made of record at the time and

6    place hereinbefore indicated.

7            I DO HEREBY FURTHER CERTIFY that the foregoing

8    typewritten pages contain an accurate transcript of my

9    shorthand notes then and there taken.

10           Dated:  July 28, 2021

11

12                            <u>/s/ Sandra E. Ehrmantraut  </u>
                              Certified Realtime Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25